**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| James R. Brown, | |
| Plaintiff, | No. 1:26-CV-01825 |
| v. | Judge Edmond E. Chang |
| P. Scott Neville, Jr., David K. Overstreet, Lisa Holder White, Joy V. Cunningham, Elizabeth M. Rochford, and Mary K. O'Brien, individually and in their official capacities as Justices of the Illinois Supreme Court; Mary Jane Theis, individually; and Sanjay T. Tailor, in his official capacity as Justice of the Illinois Supreme Court, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Retired state-court judge James Brown was appointed by the Illinois Supreme Court to a temporary assignment on the Cook County Circuit Court. R. 1, Compl. ¶¶ 20, 35.[1] But after the Illinois Supreme Court Justices learned of certain statements that he made in an online column published before the appointment, the Justices terminated the assignment. *Id.* ¶¶ 41–42; R. 1-8, Pl.'s Exh. 6, Compl. Exh. 8, 01/26/2026 Vacatur. Brown brings free-speech and due-process challenges against the Illinois Justices. *Id.* ¶¶ 1, 3, 46–101. Brown moves for a preliminary injunction to

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Citations to Brown's exhibits from the preliminary-injunction hearing are "Pl.'s Exh." followed by the number. This Court has federal-question jurisdiction over this case. 28 U.S.C. § 1331.

order the Justices to reinstate him to the temporary assignment. R. 7, Pl.'s Mot. The Defendants oppose the motion, and cross-move to dismiss Brown's claims under Civil Rule 12(b)(6). R. 14, Defs.' Mot; R. 15, Defs.' Br. As explained in this Opinion, abstention is warranted, so the preliminary-injunction motion is denied. At the same time, the Defendants' motion to dismiss is also denied because Brown has adequately stated viable due-process and free-speech claims. The Court stays the case to give Brown the chance to seek relief in state court.

## I. Background

Because this case arises out of the Illinois Supreme Court's appointment of a retired judge to serve in a temporary assignment, it makes sense to first describe the source of that appointment authority. Article VI of the Illinois Constitution established the state judiciary. Section 16 of that article vests the state Supreme Court with "[g]eneral administrative and supervisory authority" over all Illinois courts. Ill. Const. art. VI, § 16. As part of that authority, the Illinois Supreme Court is authorized by the state's constitution to "assign a Judge temporarily to any court." Compl. ¶ 24; Ill. Const. art. VI, § 16. The high court may also assign retired judges (like Brown) to judicial service. Compl. ¶ 25; Ill. Const. art. VI, § 15(a) ("Any retired Judge or Associate Judge, with his or her consent, may be assigned by the Supreme Court to judicial service ….").

The Illinois Constitution also addresses the disciplinary process—discipline all the way up to removal—that applies to Illinois state judges. Section 15 of Article VI sets up a system with (on the front end) an investigating board and (on the back end)

2

a decision-making commission. In particular, the state constitution establishes a "Judicial Inquiry Board" "with authority to conduct investigations, receive or initiate complaints concerning a Judge or Associate Judge, and file complaints with the Courts Commission." Ill. Const. art. VI, § 15(b)–(c). With four-year term limits and certain political-party limits, the Board is comprised of two Circuit Judges selected by the Illinois Supreme Court, four non-lawyers selected by the governor, and three lawyers selected by the governor. Ill. Const. art. VI, § 15(b). The Board initiates and prosecutes complaints against state judges, and then the "independent Courts Commission … hear[s] complaints filed by the Judiciary Inquiry Board." Ill. Const. art. VI, § 15(c), (e).

In considering complaints filed by the Board, the Courts Commission must provide "notice and public hearing." Ill. Const. art. VI, § 15(e). The categories of misconduct that could justify discipline are spelled out in Section 15(e): "for willful misconduct in office, persistent failure to perform his or her duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute." *Id*. If a state judge engages in those categories of misconduct, then the Courts Commission may remove the judge from office, suspend the judge without pay, or censure or reprimand the judge. *Id*.

With that legal framework in place, it is time to turn to this particular case. Brown served as a Cook County Circuit Court Judge from December 2002 until December 2020, when he retired for health reasons. Compl. ¶¶ 17, 21; R. 29, Hearing Tr. at 6–7. On September 5, 2025—when he was still retired—Brown authored an

3

online opinion column entitled, "His Judgement Cometh and That Right Soon." Compl. ¶ 22; R. 1-2, Compl. Exh. 2, Column at 2.[2] Invoking his prior judicial service, the author byline read, "The Honorable Judge James R. Brown," *id.*, and did *not* note that Brown was retired. The second sentence also invoked Brown's prior judgeship, announcing that "[t]his Honorable Court hereby declares" that there is reason "for renewed faith in the American Justice System." *Id.* The alleged reason for that faith:

> Justice awaits those who brazenly and viciously demonized the 77 million Trump supporters. Accountability, in one form or another, is coming to the George Soros-funded progressive prosecutors who waged "lawfare" against President Trump.

*Id.* Brown defined "lawfare" as the "strategic use of the legal system as a tool to achieve a political objective." *Id.* at 5. Among others, Brown discussed a civil fraud case against Trump in New York state court presided over, in the column's words, "Leftist Judge Arthur Engeron." *Id.* at 6. And Brown described a New York state prosecution of Trump that was carried out "[w]ith the assistance of conflicted Judge Juan Merchan." *Id.* The column, which was published on the John Kass News blog, also commented on no fewer than two dozen other topics, ranging from pandemic lockdowns, the House Select Committee to Investigate the January 6th Attack on the United States Capitol, "8 time convicted felon George Floyd," the Black Lives Matter movement, the Russian invasion of Ukraine, and so on. *Id.* at 2–9; Compl. ¶ 22. At the column's end, the author biography again referred to the author as "The

---

[2]The page-number citation is to the PDF page of Exhibit 2, rather than the numerical page of the column (which does not have a page number on the bottom of the page, an unsurprising absence given that the column was published online on a blog).

Honorable Judge James R. Brown." Column at 10. A few weeks after the column's publication, on September 29, 2025, Brown also appeared on the John Kass podcast to discuss the column. Compl. ¶ 23.

A couple of weeks after the column was published—but before Brown's appearance on the podcast—Brown received an email from the Illinois Judges Association. Compl. ¶ 26. The email invited retired Illinois Circuit Court and Appellate Court judges to apply for temporary recall appointments to fill 12 vacancies in the Cook County Circuit Court. *Id.*; Hearing Tr. at 8; R. 1-3, Pl.'s Exh. 1, Compl. Exh. 3, Recall Notice. Interested judges were directed to submit a statement of interest and a resume by October 13, 2025. Compl. ¶ 28; Recall Notice. The recall notice listed the salary for a Circuit Court judge as $258,158. Compl. ¶ 29; Recall Notice. The notice also explained that three Illinois Supreme Court justices from Cook County would decide the judicial appointments after reviewing the applications submitted by the deadline. Compl. ¶ 32; Recall Notice.

In response to the notice, on October 3, 2025, Brown submitted his resume and cover letter to apply for an appointment. Compl. ¶ 33; R. 1-4, Pl.'s Exh. 2, Compl. Exh. 4, Brown Recall Application. In December 2025, Brown was informed by email that he had been selected by the Illinois Supreme Court for temporary assignment to the Cook County Circuit Court. Compl. ¶ 34; Hearing Tr. at 9. The assignment would start on December 15, 2025, and conclude on December 7, 2026. Compl. ¶¶ 34–35; Hearing Tr. at 9; R. 1-5, Pl.'s Exh. 3, Compl. Exh. 5, Appointment Order. Under the assignment order, Brown began his term on December 15, 2025, in Traffic Court.

Compl. ¶ 36; Hearing Tr. at 10. From then until January 12, 2026, Brown heard around 1,000 traffic cases. Hearing Tr. at 10–11. According to Brown (and no evidence contradicted his testimony), no litigants complained about his service on the bench during the assignment. *Id.* at 11.

But opposition emerged in another form. *See* Compl. ¶¶ 38–39. First, the Cook County Bar Association released a public statement asserting that Brown's column and statements on the podcast violated the Illinois Code of Judicial Conduct and "demonstrate[d] a lack of civility, character, and sensitivity to diversity, while underscoring critical questions on whether he can fairly and impartially uphold the rule of law as a sitting judge serving the citizens of Cook County." *Id.* ¶ 38; R. 1-6, Pl.'s Exh. 5, Compl. Exh. 6, CCBA Letter. In the same vein, on January 5, 2026, the Chicago Council of Lawyers published an open letter addressed to the Illinois Supreme Court asking that it "exercise [its] discretion to reverse" the assignment order. Compl. ¶ 39; R. 1-7, Pl.'s Exh. 4, Compl. Exh. 7, Council Letter. Neither letter mentions that the association had reached out to Brown to engage in a discussion before the letters' publication. *See generally* CCBA Letter; Council Letter. Consistent with that omission, Brown testified that neither association had contacted him before issuing the letters. Hearing Tr. at 12–13. Instead, Brown heard about the letters from a friend, a retired court reporter, who texted the letters to Brown. *Id.* at 12–13.

After learning about the letters, Brown contacted both the presiding judge of Traffic Court (the division to which Brown was assigned) and the Chief Judge of the Cook County Circuit Court. Hearing Tr. at 13–14. Brown explained to both of them

that he would not allow his political and personal opinions influence decisions made on the bench. *Id.*. Both the presiding judge and the Chief Judge assured Brown that the issue would "go away" or "die down." *Id.* at 14. But that is not what happened: on January 26, 2026, Brown's appointment was vacated by the Illinois Supreme Court. Compl. ¶¶ 40–41; 01/26/2026 Vacatur; Hearing Tr. at 15–16. The Illinois Supreme Court did not offer Brown a hearing of any kind, whether before or after the issuance of the vacatur order. Compl. ¶¶ 43–44; Hearing Tr. at 15–16. Soon after the January 26 vacatur, media stories referred to an unsigned statement, issued by the Illinois Supreme Court, which acknowledged that Brown had been removed from the bench because of the column and podcast statements. Compl. ¶ 42 & n.2; Hearing Tr. at 17–18. Around one week later, a lawyer-blogger provided Brown with what the blogger reported was the text of the statement. *See* Pl.'s Exh. 7, Leyhane Email. The statement asserted that "Judge Brown's public statements, once he was sitting as an active judge," allegedly violated two rules of the Illinois Code of Judicial Conduct. *Id.* at 1.

Brown filed this action against the Illinois Supreme Court Justices, in a mix of their official and individual capacities, and moved for a preliminary injunction reinstating him to the temporary assignment on the Cook County Circuit Court. Compl.; Pl.'s Mot. The Justices oppose the preliminary-injunction motion and argue, as threshold issues, that the Court should abstain from hearing the case, and that Brown is barred from seeking injunctive relief against the Justices under 42 U.S.C. § 1983. Defs.' Mot.; Defs.' Br. at 9–10, 13. At the same time, the Justices move to

dismiss the First Amendment free-speech claim and the Fourteenth Amendment due-process claims for failure to adequately state a claim. Defs.' Br. at 13–20.

## II. Legal Standards

### A. Standard for Issuing Preliminary Injunctions

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). "To prevail on a motion for a preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (per curiam) (cleaned up).[3] If the moving party meets these requirements, then the Court balances the nature and degree of the potential harm to each party, the likelihood of each party to prevail at trial, and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418, 434 (2009) (requiring a strong showing of likelihood of success and disapproving that "better than negligible" is enough (cleaned up)). Ultimately, the moving party bears the burden of showing that a preliminary injunction is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## B. Pleading Standard to Adequately State a Claim

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)). At the same time, the Supreme Court instructs that "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Seventh Circuit has drawn a context-dependent distinction between relatively straightforward employment discrimination claims versus more complex claims. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404–05 (7th Cir. 2010).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The

9

allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678–79.

### III. Analysis

### A. Injunction Bar in Section 1983

As a threshold matter, the Court must address whether 42 U.S.C. § 1983 bars the request for injunctive relief against the Illinois Justices. In 1996, Congress amended Section 1983—which is the primary vehicle to assert federal constitutional claims against state and local officials—to ban injunctive relief against judges when they act in their judicial capacity: "in any action brought against a judicial officer for an act or omission taken in such officer's *judicial capacity*, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (emphasis added); *Smith v. City of Hammond*, 388 F.3d 304, 307 (7th Cir. 2004). Here, if the Illinois Justices acted in their judicial capacity when they vacated Brown's appointment, then injunctive relief is banned unless declaratory relief is unavailable to him. *See Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023) (observing that when an officer acts in his judicial capacity, then injunctive relief can only be granted if declaratory relief was unavailable). But if the Justices acted outside their judicial capacity when they vacated the appointment, then the Section 1983 bar does not apply at all. *See File v. Martin*, 33 F.4th 385, 390–91 (7th Cir. 2022) (holding that Section 1983 did not bar the plaintiff's claim for injunctive relief because "the justices have been sued in their enforcement capacity, not their legislative or judicial capacity").

10

To interpret "judicial capacity" in Section 1983, both sides turn to the caselaw on judicial immunity. Defs.' Br. at 10–13; R. 18, Pl.'s Opp. and Reply at 6–10. It makes sense to rely on that source for interpretive help because the 1996 amendment overruled *Pulliam v. Allen,* 466 U.S. 522, 541–42 (1984), which had held that judicial immunity did not protect judges from injunctions entered under Section 1983. *File,* 33 F.4th at 391 ("Congress abrogated *Pulliam*'s holding in 1996 by amending § 1983 to expressly bar such [prospective-relief] claims."). Judicial immunity protects only those actions taken in the "judge's judicial capacity," *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam), unless the judicial action was "taken in the complete absence of all jurisdiction," *id.* at 12. "[W]hether an act by a judge is a 'judicial' one relates to the nature of the act itself, *i.e.*, whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.*, whether they dealt with the judge in his judicial capacity." *Id.* (cleaned up).

Brown argues that the vacatur of his appointment was a non-judicial act because under the Illinois Constitution, the Illinois Supreme Court does not adjudicate judicial discipline. Instead, as explained in the background section above, judicial discipline is initiated on complaints filed by the Judicial Inquiry Board and then adjudicated by the Illinois Courts Commission. *See supra* at 2–3; Ill. Const. art. VI, § 15(b)–(j). The Justices argue that the Illinois Supreme Court's exercise of its power under the Illinois Constitution to assign retired judges to active service—and correspondingly to remove them—is a judicial act. Defs.' Br. at 10–13.

11

But employment decisions made by judges are not necessarily deemed to be decisions made in the judges' *judicial* capacity. In *Forrester v. White*, 484 U.S. 219 (1988), the Supreme Court held that a state judge who demoted and discharged a court-employed probation officer did not enjoy judicial immunity in a Section 1983 action for damages, *id.* at 220–21. Although the Supreme Court acknowledged that it "ha[d] never undertaken to articulate a precise and general definition of the class of acts entitled to immunity," the "decided cases … suggest an intelligible distinction between judicial acts and the administrative, legislative, or executive functions that judges may on occasion be assigned by law to perform." *Id.* at 227. And "[a]dministrative decisions, even though they may be essential to the very functioning of courts, have not … been regarded as judicial acts." *Id.* at 228; *see also Ex parte Virginia*, 100 U.S. 339, 348 (1879) (holding that the duty of selecting jurors "might as well have been committed to a private person as to one holding the office of a judge," and that "the act … is to be determined by its character, and not by the character of the agent"). The Supreme Court held that the state judge had acted in an *administrative* capacity when the judge demoted and then later discharged the probation officer. *Forrester*, 484 U.S. at 229. The importance of the employment decision did not transform it into a judicial act. *Id.* The Court acknowledged that court-employment decisions of this kind "may have been quite important in providing the necessary conditions of a sound adjudicative system," but those decisions were "not themselves *judicial* or *adjudicative*." *Id.* (emphases added). The Supreme Court went on to liken the judge's employment decision to the same type of employment decision that a district

attorney might make as to an assistant prosecutor: "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other Executive Branch official who is responsible for making such employment decisions." *Id.* And it did not matter that only judges were authorized to hire or fire probation officers under Illinois law: to "conclude that, because a judge acts within the scope of his authority, such employment decisions are … converted into 'judicial acts,' would lift form above substance." *Id.* at 230.

*Forrester* governs here: the Illinois Justices did not act in their "judicial capacity," 42 U.S.C. § 1983, when they vacated Brown's appointment. The decision to appoint a judge to the bench (or a decision to undo an appointment) is not of the same nature as "paradigmatic judicial acts," that is, acts "resolving disputes between parties who have invoked the jurisdiction of a court." *Forrester*, 484 U.S. at 227. Nothing about the termination of a judge's service is "adjudicative," *id.* at 226, because there are no parties who have invoked the court's jurisdiction to decide cases and no parties presenting or defending against a claim. Indeed, the laws of some states give administrators or executive-branch officials a role in deciding the temporary assignment of judges. *See, e.g.*, N.Y. Ct. Admin. R. § 33.0 ("Temporary assignments of judges and justices of the Unified Court System … shall be made by the Chief Administrator of the Courts …")[4]; 201 Pa. Code R. 701(C)(2) ("Upon the recommendation of the Court

---

[4]The Chief Administrator does not have to be a judge. *See* N.Y. Jud. Law § 210(3) ("The chief administrator *may* be a judge or justice of the unified court system, in which event

13

Administrator, the Chief Justice may … assign any retired … judge or justice to temporary judicial service ….")[5]; Me. Stat. tit. 4, § 157-B ("The Governor … may appoint any eligible judge to be an Active Retired Judge … for a term of 7 years …."). So there is nothing inherently adjudicative in the *character* of the act of appointing a retired judge to a temporary assignment. It is true that Illinois vests the state high court with sole authority to make temporary assignments. Ill. Const. art. VI, § 15(a). But *Forrester* teaches that the mere fact that "only a judge can hire or fire probation officers" is not "significant." 484 U.S. at 230. Just so here: for purposes of interpreting the term "judicial capacity," 42 U.S.C. § 1983, it matters not that Illinois law happens to vest assignment authority only in the Illinois Supreme Court.

It would be reasonable to argue that the appointment of a judge to the bench is unlike the hiring or firing of probation officers. Judges exercise the judicial power, whereas probation officers (and all other court employees) do not. But *Forrester* forecloses this argument too. Remember that the Supreme Court, in concluding that an

---

he shall be called the chief administrative judge of the courts, and he shall have all the functions, powers and duties of the chief administrator." (emphasis added)); N.Y. Ct. Admin. R. § 1.2 (noting that "[i]f a judge is appointed" as Chief Administrator, "he shall receive his judicial salary and such additional compensation as may be available by appropriation, and his actual and necessary expenses").

[5]The Court Administrator does not have to be a judge. The Pennsylvania Supreme Court has the power to appoint and remove a Court Administrator. *See* 42 Pa. Stat. and Cons. Stat. § 1901; *see also* Pa. Const. art. V, § 10(b). The current Court Administrator, Andrea Tuominen, was not a judge prior to her appointment. Instead, she held various roles within the Administrative Office of Pennsylvania Courts, including assistant court administrator and deputy court administrator. *See* Court Administrator, The Unified Judicial System of Pennsylvania, https://www.pacourts.us/judicial-administration/court-administrator (last accessed May 31, 2026).

employment decision is not judicial in nature, relied on an analogy to the employment decisions of chief prosecutors in hiring assistant prosecutors: "a judge who hires or fires a probation officer cannot meaningfully be distinguished from a district attorney who hires and fires assistant district attorneys …." *Forrester*, 484 U.S. at 229. Assistant prosecutors wield executive power just as judges exercise judicial power, so the decision to appoint a judge to the bench does not convert the employment-like nature of the decision to judicial in nature.

The underlying purpose of the judicial-immunity doctrine also suggests that a decision to make (or to undo) a temporary judicial assignment is non-judicial in nature. In *Forrester*, the Supreme Court explained that judicial immunity ultimately protects not primarily judges, but instead serves the interests of society at large. 484 U.S. at 226–27. This is because without judicial immunity, lawsuits by losing litigants against judges "would provide powerful incentives for judges to avoid rendering decisions likely to provoke such suits." *Id.* at 227. That influence on decision-making—elevating a judge's personal interests over the right decision under the law and the facts—is anathema to the Rule of Law. Plus, on the other side of the ledger, "[m]ost judicial mistakes or wrongs are open to correction through ordinary mechanisms of review." *Id.* In contrast, the relative infrequency of temporary assignments, *see* Recall Notice (email soliciting applications for only 12 judicial seats), is not likely to generate an "avalanche of suits," *Forrester*, 484 U.S. at 226, disputing assignment decisions and terminations. (The scarcity of suits of this kind in the caselaw bears this out.)

Against all this, the Illinois Justices rely on *Guarino v. Larsen*, 11 F.3d 1151, 1159 (3d Cir. 1993), to argue that the decision to terminate an assigned retired judge is a judicial act. Defs.' Br. at 11–12. But the issues presented in *Guarino*, as well as the nature of the decision made by the state court there, differ from the case at hand. In *Guarino*, the Third Circuit considered a challenge to the Pennsylvania Supreme Court's decision to revoke the assignment of a retired judge to a state court due to his treatment of potential jurors. 11 F.3d at 1154. The retired judge filed suit in federal district court to challenge the revocation. *Id.* Around two weeks after the retired judge filed suit in federal court, the Pennsylvania Supreme Court issued a second order, this time directing the judge to appear before the court to "show cause why the order entered on November 10 … should not remain in full force and effect." *Id.* at 1155. Put another way, the state supreme court convened a hearing at which the judge could present a challenge to the revocation. But the retired judge failed to appear at the hearing. *Id.* So the Pennsylvania Supreme Court issued an order affirming the termination of the assignment. *Id.* In the final order, the state high court explained that "by virtue of the … hearing it had afforded Judge Guarino [an] opportunity to present all the *facts, legal contentions and other considerations* he deem[ed] appropriate and relevant." *Id.* (emphasis added).

In the federal lawsuit, the Pennsylvania high court moved to dismiss the complaint on the ground that the court's orders "constituted an adjudication of the state's highest court." *Guarino*, 11 F.3d at 1155. The district court denied the motion, holding that the Pennsylvania Supreme Court's actions "had been administrative rather than

adjudicative," and issued an injunction against the justices of the Supreme Court of Pennsylvania requiring them to reinstate the judge.[6] *Id.* at 1155–56. On appeal the Third Circuit disagreed, ultimately holding that the lower federal courts had no subject matter jurisdiction under the *Rooker-Feldman* doctrine (more on that below). *Id.* at 1160–62. But along the way to reaching that ultimate holding, the Third Circuit held that the state supreme court's *first* order—the one that actually revoked the retired judge's assignment—was *not* adjudicative. *Id.* at 1158–59. Because the first order "was issued under the powers granted to the supreme court to *administer* the state courts," "it was not an attempt to construe the meaning of those laws and to apply them to particular facts." *Id.* (emphasis added). *Guarino* also observed that "the Pennsylvania Supreme Court did not apply any other laws in issuing" the first order: it "did not gather evidence, nor did it ask for any arguments as to whether Judge Guarino had violated some legal condition of his assignment." *Id.* Applied here, that is the same lack of adjudication that describes the termination of Brown's appointment. So, rather than support the argument of the Illinois Justices on the judicial nature of the termination, this first part of *Guarino*'s reasoning actually refutes it.

It is true that the Third Circuit held that the third order *was* adjudicative, at least for purposes of applying the *Rooker-Feldman* doctrine. *See Guarino*, 11 F.3d at 1159. That doctrine bans lower federal courts from reviewing state-court judgments, over which (generally speaking) only the United States Supreme Court has federal

---

[6]The defendants argued that the orders were reviewable only by the Supreme Court under 28 U.S.C. § 1257 and the *Rooker–Feldman* doctrine. *Guarino*, 11 F.3d at 1155.

appellate jurisdiction. *Skinner v. Switzer*, 562 U.S. 521, 531–32 (2011). In the third order in *Guarino*, "the Pennsylvania Supreme Court reached the *legal* conclusion that [t]he temporary assignment of a retired judge to judicial service is a matter solely within the discretion of this Court [the Pennsylvania Supreme Court], and any such assignment may be revoked for any reason at this Court's discretion." *Id.* at 1159 (emphasis in original) (cleaned up). The Third Circuit explained that the second order, which ordered Guarino to appear before the state high court to show cause why the first order should not remain in full force and effect, "could be interpreted as having offered Judge Guarino the opportunity to argue that the earlier administrative action of the Pennsylvania Supreme Court had violated both Pennsylvania law *and* the United States Constitution." *Id.* at 1160 (emphasis in original). Although the scope of the convened hearing was not crystal clear, at the least Guarino should have appeared at the hearing and attempted to present the legal claims to the Pennsylvania Supreme Court. *Id.* at 1161. So, for purposes of the *Rooker-Feldman* doctrine, Guarino had failed to litigate his claims through the state system and up to the United States Supreme Court, thus barring him from invoking the jurisdiction of the lower federal courts. *Id.* at 1161–62.

In contrast, here the Illinois Supreme Court order that terminated Brown's assignment simply declared that "[t]he assignment of Retired Circuit Judge James R. Brown to duty in the Circuit Court of Cook County by order of December 11, 2025, is vacated." 01/26/2026 Vacatur. The order convened no hearing, invited no factual presentation, and solicited no legal arguments on whether Brown had violated some

legal condition of his assignment. *See id.* Indeed, the vacatur order is much more like the first order in *Guarino* than the third. What's more, the Third Circuit examined the third order in *Guarino* for purposes of applying the *Rooker-Feldman* jurisdictional doctrine, not for purposes of determining whether the decision to terminate the assignment enjoyed judicial immunity, which is the source of Section 1983's injunctive-relief ban. *See* 11 F.3d at 1159–62. Indeed, *Guarino* did not discuss judicial immunity, let alone cite *Forrester v. White.* And the rationale underlying *Rooker-Feldman* is jurisdictional in nature—an application of the principle that lower federal courts have limited jurisdiction, and (generally speaking) review of state-court judgments is not within that jurisdiction. *See Skinner*, 562 U.S. at 531–32. Judicial immunity serves the entirely different purpose of promoting judicial decision-making as based on societal interests over judges' personal interests. *See Forrester*, 484 U.S. at 226–27. So *Guarino* is inapt to the termination of Brown's assignment. In sum, because the order to vacate Brown's assignment was not adjudicative in nature, the Section 1983 bar on injunctive relief "against a judicial officer for an act or omission taken in such officer's judicial capacity," 42 U.S.C. § 1983, is inapplicable.

### B. Abstention

Next up is whether abstention is warranted in this case. The Illinois Justices argue that the Court should abstain from jurisdiction over this action based on principles of federalism and comity. Defs.' Br. at 9–10. Brown argues that the principles of federalism and comity are not implicated because the relief that he seeks—to finish the remainder of his one-year judicial recall term, a declaration that his

constitutional rights were violated, and damages—is allegedly narrow. Pl.'s Opp. and Reply at 19–23.

Generally speaking, federal courts have an "unflagging obligation" to exercise jurisdiction over cases in which subject matter jurisdiction applies. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Although "abstention is the exception, not the rule," a federal court "may, and often must, decline to exercise its jurisdiction where doing so would intrude upon the independence of the state courts." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1070–71 (7th Cir. 2018) (cleaned up). Over time, the Supreme Court has adopted a set of traditional abstention doctrines, each taking on the names of the cases establishing them. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498, 500 (1941) (establishing *Pullman* abstention to avoid unnecessary constitutional adjudication); *Burford v. Sun Oil Co.*, 319 U.S. 315, 333–34 (1943) (establishing *Burford* abstention, under which federal courts abstain from deciding unsettled questions of state law that relate to a complex state regulatory scheme); *Younger v. Harris*, 401 U.S. 37, 43–45 (1971) (establishing *Younger* abstention to avoid federal jurisdiction intruding into ongoing important state proceedings); *Colo. River Water Conservation Dist.*, 424 U.S. at 818–19 (establishing *Colorado River* abstention to allow the dismissal of a federal suit when there is a concurrent state proceeding). But those doctrines do not cover all instances when abstention is appropriate. "To insist on literal perfection" for the fit between a case and the abstention doctrines "risks a serious federalism infringement." *J.B. v. Woodard*, 997 F.3d 714, 723 (7th Cir. 2021).

20

In *Courthouse News Service v. Brown*, the Seventh Circuit held that the district court should have abstained from exercising jurisdiction over a case in which a legal-news outlet challenged, on First Amendment grounds, the delay in public access to electronically filed complaints. 908 F.3d at 1065–66. The Seventh Circuit explained that the principles of equity, comity, and federalism dictated that federal courts should abstain in favor of the state courts as forums to resolve the claim. *Id.* at 1071–72. In part, the opinion relied on *SKS & Associates., Inc. v. Dart*, 619 F.3d 674 (7th Cir. 2010), in which the Seventh Circuit "applied the principles of *Younger* and declined to exercise jurisdiction over a Section 1983 action against the Chief Judge and the Sheriff of Cook County" in which the plaintiff contested a state court's general order directing the Sheriff not to carry out residential evictions during periods of extreme cold weather. *Courthouse News*, 908 F.3d at 1073. As characterized by *Courthouse News*, the opinion in *SKS & Associates* reasoned that "it was not appropriate for the federal courts, in the face of these principles of equity, comity, and federalism, to undertake the requested supervision of court operations." *Id.*; *see also SKS & Assocs.*, 619 F.3d at 682. Comity in particular gives respect to the founding principle that state governments are generally co-sovereign with the federal government, which in turn means that "state courts are co-equal to the federal courts." *Courthouse News*, 908 F.3d at 1074. This principle "takes on special force when federal courts are asked to decide how state courts should conduct their business." *Id.*

The same principle applies here. Thorny and unprecedented questions of Illinois *state* law abound in this case. Under the Illinois Constitution, does the Illinois

21

Supreme Court have the authority to unilaterally terminate temporary assignments? Or does the Illinois Constitution confer sole authority to remove judges on the Courts Commission? *See* Ill. Const. art. VI, § 15(e). Or is the answer in between, authorizing the Illinois Supreme Court (and only that court) to terminate temporary assignments based on a reduction in case load (and only for that reason), but authorizing the Courts Commission (and only that commission) to terminate temporary assignments based on misconduct, failure to perform duties, and conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute (and only for those reasons)? *See* Ill. Const. art. VI, § 15(c), (e). Does removal authority under the Illinois Constitution (wherever it resides) permit consideration of the conduct of assigned judges that happened when they were private citizens before starting temporary service? Same question under the Illinois Code of Judicial Conduct, which is adopted by the Illinois Supreme Court. *See* Ill. Sup. Ct. R. art. XI. Does the Code apply to pre-service conduct at all? Even if the Code does not generally apply to pre-service conduct, what about to the conduct of retired judges who wish to be able to apply for assignment? If the Code *does* apply to pre-service conduct, what (if any) provisions were violated by the column and podcast statements? The answers to these questions are Illinois state law questions, and the answers could obviate the need to consider any of the federal constitutional claims presented by Brown.

Indeed, the Illinois Supreme Court has the final say—subject to federal constitutional constraints—on the interpretation of state law and the Illinois Constitution. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the

state is the final arbiter of what is state law."). It might very well be that after an adversarial presentation, Illinois courts will conclude that only the Courts Commission can remove a judge based on alleged misconduct, while the Illinois Supreme Court can remove an assigned retired judge based only on a lack of operational need. So long as the Illinois state courts can provide a forum for the injunctive-relief claim, a federal district court injunction requiring Brown's reinstatement to the Cook County Circuit Court would jump the gun and would declare "how state courts should conduct their business," *Courthouse News*, 908 F.3d at 1074, even before the co-equal state-court system had a chance to address the metes and bounds of judicial assignments.

The Illinois Justices concede that they are not aware of any jurisdictional obstacles to Brown filing an action in an Illinois Circuit Court.[7] Hearing Tr. at 38; R. 26, Defs.' Supp. Br. at 1–2 (conceding that an Illinois circuit court has jurisdiction to hear

---

[7]Specifically, the Justices concede that an Illinois Circuit Court would have jurisdiction to hear Brown's claims and could award money damages on his *individual*-capacity claims. R. 26, Defs.' Supp. Br. at 1–2. But Brown will not be able to bring his claims for damages against the State of Illinois in an Illinois Circuit Court. *Id.* at 2–3. The Illinois Court of Claims has exclusive jurisdiction to award damages against the State of Illinois and its agencies under 705 ILCS 505/8. But the Court of Claims may only award damages for tort claims, claims based on a contract with the State of Illinois, or claims brought under a state statute. *Id.* The Court of Claims "does not have subject matter jurisdiction to entertain claims based on federal statute," and "federal and state constitutional issues are outside the jurisdiction of the Court of Claims." *Michaelis v. Ill. Dep't of Mental Health & Developmental Disabilities*, 61 Ill. Ct. Cl. 270, 272 (2008). So Brown may not bring claims against Illinois for damages in the Court of Claims. Because Brown argues that the Justices' acts "are not acts of the State," this jurisdictional issue is not currently implicated. R. 27, Pl.'s Supp. Br. at 3–4. The bottom line is that injunctive relief (the subject of the preliminary-injunction motion) is available in state courts.

Brown's claims and could award money damages for his individual-capacity claims). According to the Justices, Brown would not face a jurisdictional bar if he were to move for reconsideration of the vacatur order in the Illinois Supreme Court itself. Hearing Tr. at 38. The Justices also acknowledge that if Brown were to file an action in a Circuit Court, after judgment is entered in the trial court, he could seek an expedited, direct appeal to the Illinois Supreme Court, skipping the Illinois Appellate Court. *Id.* at 39; *see* Ill. Sup. Ct. R. 302(a), (b).

In sum, Illinois state courts should decide—at least in the first instance—who should exercise Illinois judicial power in temporary judicial assignments. The unprecedented Illinois constitutional and Judicial Code questions counsel in favor of state-court litigation at the outset. So the Court stays this action pending resolution of Brown's claims in state court. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 14 (1983) (observing that "a District Court may … postpone the exercise of its jurisdiction" under the doctrine of abstention); *General Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 710 (7th Cir. 1991) (noting that "should the [district] court decide that abstention is proper, it can choose either to dismiss the case outright or stay the federal proceeding so as to preserve the court's ability to resolve any federal law issues which are not addressed by the state court"). If this decision to abstain is wrong, then the Court stands ready on remand to promptly move the case forward. (Though of course appellate jurisdiction is for the Seventh Circuit to decide, it appears that Brown should be able to pursue an interlocutory appeal of the abstention decision. *See Loughran v. Wells Fargo Bank, N.A.*, 2 F.4th 640, 645 (7th Cir. 2021) ("The

24

Supreme Court has recognized … that certain stay orders should be treated as final for purposes of appeal if the practical effect is equivalent to a dismissal.").)

## C. Preliminary Injunction

Even if the Court had not abstained from jurisdiction over this action under *Courthouse News*, the Court would have denied the preliminary-injunction motion. To be clear, this is an alternative to the primary holding of abstention. In the ideal world the Court would not interpret the Illinois Constitution ahead of the Illinois state courts. But offering the explanation for this alternative could expedite the matter if the case moves forward and is remanded from the Seventh Circuit.

To be entitled to preliminary relief, Brown "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. The Court discusses each element in turn.

### 1. Likelihood of Success

### a. Procedural Due Process

The Due Process Clause in the Fourteenth Amendment provides that "[n]o State shall … deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Brown argues that the Justices violated his procedural due process rights when they terminated his assignment without notice and a chance to be heard. Pl.'s Mot. at 8–11. To determine whether Brown has adequately alleged a due process violation, "we first ask whether [Brown] has been deprived of a

25

protected liberty or property interest; and second … whether that deprivation occurred without due process." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 365 (7th Cir. 2019).

"A plaintiff is entitled to procedural due process guarantees of notice and hearing if that plaintiff is able to demonstrate that he had a property interest in continued employment." *Quinn v. City of Chicago*, 646 F. Supp. 549, 550 (N.D. Ill. 1986). To decide whether Brown "has a property interest protected by due process, we look to an independent source, such as state law, rather than the U.S. Constitution itself." *See GEFT Outdoors*, 922 F.3d at 365. "To have a protectable property interest in a benefit, such as continued employment, a plaintiff must have more than an abstract need or desire for it and more than a unilateral expectation of it." *Cole v. Milwaukee Area Tech. Coll. Dist.*, 634 F.3d 901, 904 (7th Cir. 2011) (cleaned up). "In the employment context, a plaintiff generally is required to show that the terms of his employment provide for termination only for cause or otherwise evince mutually explicit understandings of continued employment." *Id.* (cleaned up). "A property interest in employment is created and defined by the terms of the employee's appointment." *Id.* (cleaned up). The question of whether a property interest exists turns on whether "an employer's discretion is clearly limited so that the employee cannot be denied employment unless specific conditions are met." *Id.* (cleaned up); *see also Quinn*, 646 F. Supp. at 550 ("In the employment context, an employee has a due process property interest in a job where there are restrictions on how the employee can be terminated.").

With that background in mind, to support the due process claim, Brown argues that the Illinois Constitution restricts the removal of state judges through only impeachment by the legislature or only after notice and public hearing at the Illinois Courts Commission. Pl.'s Mot. at 9–10; Ill. Const. art. IV, § 14 ("The House of Representatives has the sole power to conduct legislative investigations to determine the existence of cause for impeachment and, by the vote of a majority of the members elected, to impeach … Judicial officers. Impeachments shall be tried by the Senate."); Ill. Const. art. VI, § 15(e) ("The Commission shall have authority after notice and public hearing … to remove from office, suspend without pay, censure or reprimand a Judge or Associate Judge for willful misconduct in office, persistent failure to perform his or her duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute."). The Justices respond that the Illinois Constitution grants the power to assign retired judges to the Illinois Supreme Court, so that "necessarily and logically include[s] the discretion to determine the length of the assignment of a recalled judge and the discretion to terminate the assignment of a recalled judge." Defs.' Br. at 14.

On review of the Illinois Constitution's constraints on the removal of judges and on review of the appointment order itself, the Court concludes (if abstention is not appropriate) that Brown has shown a likelihood of success on the procedural due process claim. Starting first with the appointment order, the order declared that Brown would be assigned as a judge "effective December 15, 2025, and terminating December 7, 2026." Appointment Order. The order thus set forth a fixed-term of

employment, rather than an open-ended, non-guaranteed at-will employment. The order went on to explicitly repeat the time period of employment: "It is ordered that the above-named judge is assigned to serve for the period indicated above ...." *Id.* On top of that, the order then specified the salary, namely, "at the rate normally paid Circuit Judges of the State of Illinois." *Id.* A fixed-term of employment at a guaranteed salary are hallmarks of a due-process protected property interest in the employment context. *See, e.g.*, *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008) (holding that the plaintiff did not have a procedural due process claim against the defendant after his discharge, in part because his employment contract did not specify a definite term of employment); *Ricker v. Fulton Cnty. Soil & Water Conservation Dist.*, 800 F. Supp. 636, 639 (C.D. Ill. 1992) ("An employee employed under a contract for a fixed term who is terminable only for cause has a property interest in continued employment which he or she cannot be deprived of without due process. ... Where an employment contract is for a fixed term, the employment is not at will, and discharge can only be for cause."). What's more, the Illinois Constitution does explicitly vest removal authority on the Courts Commission—not the Illinois Supreme Court—to remove judges for specified reasons: "for willful misconduct in office, persistent failure to perform his or her duties, or other conduct that is prejudicial to the administration of justice or that brings the judicial office into disrepute." Ill. Const. art. VI, § 15(e). The specificity of the decision-making entity (the Courts Commission) and the specificity of the grounds for removal also support the creation of a protectible property interest for state judges in their employment. It would be

28

one thing if the Illinois Constitution did not so specifically address removal of judges; if that were the case, then the Illinois Justices' argument that the power of appointment implies the power of removal would have much greater force. But the state constitution's extraordinarily detailed judicial-disciplinary process—from the creating of the charging Board, to the composition of the Courts Commission (complete with detailed recusal rules), to the requirement of notice and public hearing, to the categories of circumstances warranting removal, and so on, Ill. Const. art. VI, § 15(b)–(j)—undermines the general notion that the power to appoint comes with it the power to remove. So Brown has demonstrated that he had a protectible property interest in the fixed-term assignment.

The next question is whether Brown was deprived of the property interest without due process. "[T]he Due Process Clause does not require that a pre-termination hearing be conducted in every case." *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 414 (7th Cir. 1994). "Generally, an employee is entitled to oral or written notice of the charges against him, an explanation of his employer's evidence, and a chance to tell his side of the story." *Meek v. Springfield Police Dep't*, 990 F. Supp. 598, 603 (C.D. Ill. 1998). Here, Brown received zero notice before his removal. Instead, with no notice of the intent to terminate, the appointment was vacated through a one-sentence order issued by the Illinois Supreme Court. Compl. ¶ 57; 01/26/2026 Vacatur; Hearing Tr. at 15–16. Naturally, absent notice, Brown also was not offered a chance to present his side of the story through a pre-termination

29

hearing, nor was he offered a hearing after termination. Compl. ¶¶ 43–44; Hearing Tr. at 15.

Brown thus has shown a likelihood of success on the merits of the procedural due process claim. The Court hastens to add, however, that the remedy for a procedural due process violation would not necessarily be reinstatement, but instead prompt notice of the reasons for the termination and a prompt hearing. As the Court explains below, the other preliminary-injunction factors counsel against preliminary reinstatement.

### b. First Amendment

On the First Amendment claim, when a preliminary injunction is sought on a free-speech basis, "the likelihood of success on the merits will often be the determinative factor." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (cleaned up). "[E]ven short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017) (cleaned up). So generally speaking "the analysis begins and ends with the likelihood of success on the merits of the [First Amendment] claim." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). Here, the Illinois Justices argue that Brown will not succeed on the free-speech claim because the Illinois Supreme Court's interest in maintaining public confidence in the judiciary outweighs Brown's First Amendment interest. Defs.' Br. at 15–20.

30

Brown's "First Amendment claim arises in the public-employment context and rests on allegations that the [Illinois Supreme Court] fired [him] in retaliation for exercising [his] free-speech rights." *Darlingh v. Maddaleni*, 142 F.4th 558, 564 (7th Cir. 2025). To show likelihood of success, Brown must demonstrate "that (1) [he] engaged in constitutionally protected speech; (2) [he] suffered a deprivation of a type that is likely to deter protected speech; and (3) [his] protected speech was a motivating factor in the deprivation." *Id.* (cleaned up). The Justices do not contest the second and third elements. *See* Defs.' Br. at 15–20. And for good reason: termination of a job is "a significant deprivation, likely to chill protected speech," *Darlingh*, 142 F.4th at 564, and the Justices concede that at this stage in the litigation, it is fair to characterize that Brown's speech was the cause of his termination, Defs.' Br. at 15–20; Hearing Tr. at 26–27. So the success (or not) of the free-speech claim turns on whether Brown's speech could be taken into account for public-employment purposes, which requires the application of *Pickering* balancing. Brown argues that he spoke as a private citizen on a matter of public concern before he applied for the temporary assignment, and his speech did not have an impact on the operation of the Cook County Circuit Court. Pl.'s Mot. at 6–8. The Illinois Justices respond that although Brown was not a sitting judge when he engaged in the speech at issue, the Illinois Supreme Court may still consider those comments (especially because Brown invoked his status as a former judge when making those comments), and that the judiciary was disrupted by the speech, as demonstrated by the letters from two bar associations. Defs.'

31

Br. at 17–18. The Justices also argue that an employer does not need to establish actual disruption when the threat of future disruption is obvious. *Id.* at 18.

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* But "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.* at 418. So the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). The operating principle for this is "that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).

The Supreme Court's opinions in *Pickering* and *Connick* provide "a two-step framework for determining whether a public employee's speech is constitutionally protected." *Darlingh*, 142 F.4th at 565. The first step requires the employee to "establish that he 'spoke as a citizen on a matter of public concern.'" *Id.* (quoting *Garcetti*, 547 U.S. at 418). "The second step asks 'whether the government had an adequate justification for treating the employee differently from any other member of the public based on the government's needs as an employer.'" *Id.* (quoting *Lane v. Franks*, 573 U.S. 228, 242 (2014)). Federal courts must "balance the interests of the employee, as

32

a citizen, in commenting on the issue of public concern against the interests of the government, as an employer, in the proper performance of its public functions" to "assess the adequacy of the government's justification for burdening an employee's speech." *Id.* Importantly, "[t]he government 'has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect [its] operations." *Id.* (quoting *Garcetti*, 547 U.S. at 418).

Under the first requirement of *Pickering*—that Brown spoke as a private citizen on a matter of public concern—Brown's column and podcast statements did address matters of public concern based on their "content, form, and context." *Connick*, 461 U.S. at 147. As detailed earlier in this Opinion, Brown's speech touched on "subject[s] of great public interest," such as lawsuits against the Trump administration, the response to the COVID-19 pandemic, and on and on and on. *Bonds v. Milwaukee County*, 207 F.3d 969, 979 (7th Cir. 2000); *see* Column. And his speech "certainly constituted participation in a public dialogue on matters of interest to the public and discussion of public issues rather than merely a personal grievance." *Bonds*, 207 F.3d at 979 (cleaned up).

But is not as clear that Brown was speaking as a mere private citizen when he published the column. *See Garcetti*, 547 U.S. at 418. Although Brown argues that he did so, the column's start and end invoked his status as a state judge, and it was not until the end that he was identified as retired. *See* Column at 2, 10. As detailed earlier in the Opinion, the byline of the column identifies him as "The Honorable Judge

33

James R. Brown," without any notation that Brown was retired. Column at 2. The column's second sentence opens, "This Honorable Court hereby declares to all the good, decent, fair-minded and loyal readers … that there is again '*Probable Cause*' for renewed faith in the American Justice System." *Id.* (emphasis in original). Again, the reference to "Honorable Court" made no mention of Brown's retirement status. *See id.* In the biography section at the column's end (nine pages later when viewed as a PDF), the article finally identifies Brown as a retired judge. *Id.* at 10. It is true that the use of a retired judge's prior title in a published article unconnected to legal representation might not cross any rules of professional conduct. But on these unique facts, it is not clear that Brown would succeed in showing that he ought to be treated as a private citizen for purposes of the *Pickering* test when he published the column as if he were a sitting judge and then, a couple months later, returned to active judicial service.

In any event, even if Brown was speaking as a private citizen, he has not shown likelihood of success at the second step of the *Pickering* test. Seventh Circuit caselaw sets forth seven factors for district courts to consider when conducting *Pickering* balancing, covering the waterfront of how the speech could affect job performance to the context in which the speech was delivered:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to

informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Darlingh*, 142 F.4th at 565–66 (cleaned up). It is not always necessary to consider every factor, and the Seventh Circuit has explained that "merely counting how many factors line up on each side is not particularly informative." *Id.* at 566 (cleaned up).

Here, it is true that no record evidence shows, or even hints, that Brown made decisions as to the specific litigants or specific issues before him based on his political views, rather than on the law and facts. But federal courts "give[] greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion). Here, the Illinois Justices argue that based on the nature of Brown's comments, the public could reasonably question his impartiality. Defs.' Br. at 17–18. The Court agrees. A judge has a particular responsibility to not only act impartially but also *promote* public confidence by avoiding the appearance of partiality. *See* Ill. Sup. Ct. R. art. XI, 1.2 ("A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety."); *see also* Ill. Sup. Ct. R. art. XI, 2.11(A)(1) (a judge should disqualify themselves in a proceeding in which their impartiality might reasonably be questioned because they have a personal bias or prejudice concerning a party or a party's lawyer). Without the power of the purse or the sword, the credibility of courts is crucial.

At the preliminary-injunction hearing, Brown acknowledged that he would not make similar statements to those in the column if he were to be reinstated as a judge because it would be inappropriate to write anything political until after his term was finished. Hearing Tr. at 19. That concession was the right one to make. As the Illinois Justices argue, some of Brown's comments "specifically challenged the integrity of other judges and of prosecutors." Defs.' Br. at 18. For example, Brown asserted that Kim Foxx, the former Cook County State's Attorney, "*deliberately* ignored her oath of office." Column at 7 (emphasis added). He criticized Foxx's exercise of prosecutorial discretion on retail-theft cases, *id.*, which is a prerogative of the executive branch. Brown opined, "Progressive prosecutors have blatantly violated their oath to uphold the law." *Id.* at 6. Given that the State's Attorney's Office is an institutional litigant that appears frequently before state judges, extra-judicial criticism of this kind—that is, criticism not levelled in a case over which the judge is presiding—could reasonably lead the public to question a judge's impartiality. The column also accused "Leftist Judge Arthur Engeron" with "assist[ing]" in the pursuit of the New York civil-fraud case against Trump. *Id.* Another New York state judge, "conflicted Judge Juan Merchan" also "assist[ed]" in the business-records prosecution against Trump. *Id.* Beyond the challenges to the integrity of judges and prosecutors, Brown also singled out certain other groups for criticism. *Id.* at 4 ("the BLM riots"); *id.* (transgender women and transgender boys); *id.* ("millions of undocumented illegal immigrants"); *id.* at 5 (Democrats). None of this is to say, of course, that judges should not hold these opinions. The First Amendment generally has nothing to say about who is right or wrong on

36

those topics. But when offering those opinions with the byline of "The Honorable Judge James R. Brown" and introducing the declarations in the column with "This Honorable Court," the *Pickering* balance—at the preliminary-injunction stage—does not favor Brown. *See also Hemminghaus v. Missouri*, 756 F.3d 1100, 1112–13 (8th Cir. 2014) (holding that a court reporter's "repeated threats to speak with the media about the county prosecutor's alleged misdeeds (including on the day before her termination) could implicate a judge's interest in avoiding the appearance of impropriety" (cleaned up)). It was reasonable for the Illinois Supreme Court to predict that Brown's comments could "create problems in maintaining … harmony" in the courtroom. *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000); *see id.* at 372 ("The Department reasonably felt that [the] speech, if left unpunished … would disrupt the operation of the Department by degrading the Department's standing with the public."). The Illinois Supreme Court's interest in preventing future disruptions (not just addressing past disruptions) outweighs Brown's speech interests. *See Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016) ("[A] government employer is allowed to consider both the actual *and* the potential disruptiveness." (emphasis in original)); *see also Greer*, 212 F.3d at 372 ("A government employer need not allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." (cleaned up)).

Moreover, the bar-association letters opposing Brown's appointment show that members of the bar already had concerns over whether Brown could "serve impartially without political motives, debunked theories, and other biases against

marginalized communities." CCBA Letter at 3; *see also* Council Letter at 2 (arguing that Brown's statements "demonstrate that [he] lacks the temperament, judgment, independence, competence, impartiality and respect for the rule of law necessary for those who serve in the judiciary"). So the Illinois Justices had evidence that the comments had already undermined public confidence—at least to the extent of two bar associations—in Brown's appearance of impartiality. Bar associations of course do not have a heckler's veto on judicial assignments. And, as noted above, the bar associations did not (so far as the record shows) reach out to Brown to give him a chance to convince them of his impartiality or to acknowledge that he would not make the same statements as a sitting judge. *See* Hearing Tr. at 12–13. But the Illinois Supreme Court need not require certainty before balancing free-speech interests against public-employer interests. It is worth again cautioning that these are conclusions reached at the preliminary-injunction stage. Indeed, as explained below, Brown has adequately stated a free-speech claim at the pleading stage, even if he has not shown likelihood of success for preliminary-injunction purposes.[8]

---

[8]It is also worth noting that Brown has pointed to Chicago Daily Law Bulletin articles authored by another sitting state judge. R. 18-1, Exhs. 1–6. The purpose of the evidence was to show viewpoint discrimination, that is, the other judge had not been removed for expressing political views because the Illinois Supreme Court supposedly favors the expressed viewpoints. Of course viewpoint discrimination could present a viable First Amendment claim and could provide an independent reason for a preliminary injunction. But right now there is zero evidence that the Illinois Justices have even read the articles, let alone took them into account in intentionally treating Brown differently from the other judge. *See* Hearing Tr. at 50–51. Nor is the other judge a *retired* judge on temporary service, which could conceivably (though the Court has concluded otherwise) give the Illinois Supreme Court (rather than the Courts Commission) the authority to remove the other judge.

## 2. Irreparable Harm & Inadequate Remedy at Law

Moving beyond likelihood of success, a "finding of irreparable harm absent an injunction is a threshold requirement for granting a preliminary injunction." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (cleaned up). "Harm is irreparable if legal remedies are inadequate to cure it." *Id.* (cleaned up). "Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Id.* (cleaned up). Brown argues that he suffers irreparable harm because his speech is still being suppressed because he does not want to say anything that will offend the Illinois Justices as the litigation is ongoing. Hearing Tr. at 41–42. He also relies on the presumption of irreparable harm in First Amendment cases. *See id.*; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

But if the Court were to grant Brown's requested injunctive relief and order his preliminary reinstatement to the bench, the breadth of his ongoing right to speak freely would—ironically—be *diminished* rather than promoted. As explained earlier, Brown himself admitted that he would *not* make statements similar to those he made in the column as an active judge. *See supra* Section III.C.1.b. The First Amendment cases establishing a presumption of irreparable harm resulted in removing speech restrictions so that the result was *more* speech, not less. *See, e.g., Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 451 (7th Cir. 2022) (observing that implementation of a work schedule, which was enjoined, deterred at least some

39

political activity); *Swart v. City of Chicago*, 440 F. Supp. 3d 926, 930 (N.D. Ill. 2020) (enjoining restrictions that prohibited forms of expression in large areas of Millennium Park). The presumption of irreparable harm at the preliminary-injunction stage does not apply on all fours to this case.

Brown also argues that back pay at the case's end would be insufficient because of the loss of his reputation. 05/06/26 Hearing Tr. at 41–42, 44. "[I]t is well established that the loss of goodwill and reputation, if proven, can constitute irreparable harm." *Life Spine*, 8 F.4th at 546. But injunctive relief "is simply incapable of erasing the fact that plaintiff was fired by [their] employer and it cannot remove the stigma and damage to reputation that often accompanies such a termination of employment." *Dos Santos v. Columbus-Cuneo-Cabrini Med. Ctr.*, 684 F.2d 1346, 1350 (7th Cir. 1982). "Thus, even if plaintiff's injury to reputation is both real and irreparable, it does not support [a] preliminary injunction …." *Id.* And Brown fails to explain how a preliminary injunction would restore his reputation in a way that final judgment or declaratory relief in his favor would not. Hearing Tr. at 45–46. Brown also argues that not being able to end his judicial career with honor is an irreparable injury, *id.* at 46, but other "external factors common to most discharged employees" do not meet the irreparable harm requirement, "however severely they may affect a particular individual," *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974). At day's end, Brown has failed to "demonstrate" by a clear showing that the "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Thus this factor cuts against entering an injunction.

### 3. Balance of Factors and Public Interest

The third element in the preliminary-injunction analysis "weighs the irreparable harm [that] the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted." *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 632 (7th Cir. 2024) (cleaned up). This factor "is a sliding scale—the more likely the moving party is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Id.* at 633 (cleaned up). The fourth and final element is consideration of the public interest in either entering a preliminary injunction or refraining from entering it.

Brown argues that the balance of equities favors him because the efficiency generated by reinstating him to the Cook County Circuit Court supports an injunction. Pl.'s Mot. at 12. The Illinois Justices argue that the balance of harms weighs against an injunction because Brown has not established that he will suffer irreparable harm, an injunction would cause harm to the public interest, and an injunction "would deprive the Illinois Supreme Court of its authority … to manage the assignment of retired judges." Defs.' Br. at 23–24.

As explained earlier, Brown has not established that he would suffer irreparable harm or does not have an adequate remedy at law, so the balance is one side of the ledger: granting a preliminary injunction instead would irreparably harm the Illinois Supreme Court in exercising its authority to oversee the "the administration of the state courts." *Courthouse News*, 908 F.3d at 1070. Put another way, if Brown were

41

preliminarily reinstated and exercised the judicial power of the Illinois court system, but it turned out that the preliminary injunction ought not to have been entered, then there would be no way to undo any of that. Brown would have presided over cases and the injunction (if wrongfully entered) would have interfered with the Illinois Supreme Court's authority to make temporary assignments. What's more, the public interest in permitting the Illinois Supreme Court to oversee temporary assignments is substantially greater than the public's interest in a particular judge obtaining a preliminary reinstatement. In sum, the balance of the parties' interests, the resulting harms in refraining from or entering a preliminary injunction, and the public's interest weighs against issuing a preliminary injunction.

### D. Motion to Dismiss

Lastly, the Court turns to the Illinois Justices' motion to dismiss the complaint for failure to adequately state viable claims. Fed. R. Civ. P. 12(b)(6); Defs.' Br. at 13–20. On procedural due process, as explained earlier, Brown is likely to succeed on the merits of the claim under the preliminary-injunction standard, so he has readily pleaded a due-process claim.

On the First Amendment claim, although Brown fell short on likelihood of success for preliminary-injunction purposes, he survives the dismissal motion. As a threshold matter, the Court accepts Brown's facts as true and draws reasonable inferences in his favor for purposes of the motion to dismiss. *Brockett v. Effingham County*, 116 F.4th 680, 682 (7th Cir. 2024). "[I]n the context of a motion to dismiss … the requirements of *Pickering* and *Connick* must be viewed through the lens

42

of our liberal, undemanding pleading standard." *Id.* at 684. So reasonable inferences on a dismissal motion—in contrast to a preliminary-injunction motion—are drawn in Brown's favor. That means that the inferences from the column's author byline, which labelled Brown as a judge without noting that he was retired, and from the column's opening paragraph, which referred to Brown as "This Honorable Court," Column at 2, must be viewed in *Brown*'s favor. Viewed through that lens, it is plausible for Brown to allege that he was speaking as a private citizen on matters of public concern. Compl. ¶¶ 78, 80–82.

With *Pickering* balancing triggered, the balance of public-employer interest and employee free-speech interest is not readily decided at the pleading stage, because "conducting these inquiries sometimes has proved difficult." *Garcetti*, 547 U.S. at 418. The facts unearthed and tested in discovery matter. *See Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002) (holding that *Pickering* balancing should not rely on speculation). In *Gustafson v. Jones*, the Seventh Circuit held that *Pickering* "contemplates a highly fact-specific inquiry into a number of interrelated factors," and that a complete record is usually necessary for *Pickering* balancing:

> While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the *Pickering* elements are assessed in light of a record free from material factual disputes. … We are not entitled to speculate as to what the employer might have considered the facts to be and what concerns about operational efficiencies it might have had, once the record shows what those concerns really were.

*Id.* So, in most cases, "application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct discovery." *Delgado v. Jones*,

43

282 F.3d 511, 517 (7th Cir. 2002). Given the plausibility of Brown's assertions that his pre-service statements did not and would not disrupt court operations, and his allegations that pre-service statements do not cause an appearance of partiality, the free-speech claim survives at the pleading stage. The parties should be permitted (if the Court had not abstained) to conduct discovery.

The Illinois Justices also argue that they are entitled to qualified immunity against monetary damages. Defs.' Br. at 20–21. State employees sued in their individual capacities "are entitled to qualified immunity under [Section] 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (cleaned up). But sometimes it is not advisable to consider qualified immunity at the pleading stage. *See Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019) (observing "that an officer's entitlement to qualified immunity often depends on the particular facts of a given case" and "the Federal Rules of Civil Procedure do not require a plaintiff to include much factual detail in a complaint" (cleaned up)). Having said that, Brown has not identified a specific Seventh Circuit or Supreme Court case that would clearly establish that the Illinois Justices violated Brown's right to procedural due process. Indeed, whether there was a protectible property interest in the temporary assignment does not appear clear cut. The same goes for removing a state judge from a temporary assignment for pre-assignment speech, particularly in the circumstance of speech in which the retired judge billed himself in an article as a sitting judge (or at least did not note that he was retired

44

until the article's end). With all that said, however, because the Court is abstaining from jurisdiction, there is no need to definitively decide qualified immunity from monetary damages right now. It is true that qualified immunity is an immunity from suit, not just judgment. But this case is stayed, so the Illinois Justices are (at least for now) enjoying the functional equivalent of qualified immunity from suit for monetary damages.

## IV. Conclusion

The Court abstains and stays the case for now. The motion for preliminary injunction, R. 7, is denied, and the motion to dismiss, R. 14, also is denied.

ENTERED:

          s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 1, 2026